United States District Court
Southern District of Texas
**ENTERED**
October 29, 2015
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| KENNETH R KOENIG, *et al*, § § Plaintiffs, § VS. § AETNA LIFE INSURANCE § COMPANY, § § Defendant. | § § § CIVIL ACTION NO. 4:13-CV-0359 § § § § |

**MEMORANDUM ON MOTION FOR JUDGMENT
AS A MATTER OF LAW [FRCP 52(C)]**

## I.   INTRODUCTION

The plaintiffs, North Cypress Medical Center Operating Company, Ltd., and North Cypress Medical Operating Company GP, LLC ("NCMC"), bring this action against defendants, Aetna Insurance Company, Aetna Health Inc., PA, Corp., Aetna Health Management, LLC, Aetna Health, Inc., and Aetna Insurance Company of Connecticut ("Aetna"), pursuant to ERISA, 29 U.S.C. §§ 1001 *et. seq.*, concerning healthcare claim benefits allegedly underpaid through healthcare Plans directly insured and/or administered by Aetna.  After NCMC concluded its presentation of evidence on its ERISA claim(s), Aetna presented its motion for judgment as a matter of law, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.  A careful review of the relevant evidence, consideration of the

applicable law and the arguments of counsel leads this Court to conclude that Aetna's motion should be granted.

## II.     FACTUAL BACKGROUND

NCMC is a physician-owned acute care hospital that opened in January of 2007. The evidence shows that prior to NCMC's opening, it informed Aetna and other similarly situated insurers that it would operate as an out-of-network facility and that it would offer a "prompt pay discount" through which some patients would receive a discount on their coinsurance obligation if they paid upfront or within a limited period of time. Aetna provides claim administrative services to various Plans under which Aetna is granted discretionary authority to construe Plan terms and determine the benefits available.

Aetna notified NCMC that it was skeptical of NCMC's "prompt pay discount" in that it appeared to be a "fee forgiving" discount and if so, would be violative of the Texas Insurance Code. As an out-of-network provider, NCMC submitted claims to Aetna pursuant to an assignment of benefits and rights it received from various Aetna Plan members for services and/or treatment rendered at NCMC. Over the term of the relationship between NCMC and Aetna, no formal charge of illegality has been asserted by Aetna against NCMC; nor have any claims been denied on that basis.

NCMC forwarded claims to Aetna for approval and payment pursuant to the Plan(s) that Aetna administered. By and large, Aetna processed NCMC's claims through its wholly-owned subsidiary, Global Claims Services ("GCS") or through Multi-Plan, a third party vendor. To facilitate this process, NCMC negotiated and executed a "Repricing Agreement" with GCS and other third party vendor(s) under Aetna's National Advantage Program ("NAP"). Under these Agreements, NCMC's claims were discounted; however, payment of the claims was more expeditious than otherwise. Based on these negotiated/discount agreements, the discounted charges became the "allowed" or "recognized charge." The "recognized charge" is the amount that Aetna used to pay NCMC's claims. The "allowed" or "recognized charge" was treated as the equivalent of the "usual customary and reasonable" rate ("UCR")[1], even though the Plan may not have specifically provided for this procedure.

On or about August 27, 2012, after several years of negotiating the "allowed" rate through GCS or Multiplan, Aetna dismissed NCMC from the negotiated claims process, and began adjudicating NCMC's claims in house. As a result, since September of 2012, NCMC argues that its claims for healthcare

---

[1] The "UCR" charge for a service or supply is the lowest of or the 'lesser of': (a) the provider's usual charge for furnishing it; (b) the charge an administrator determines to be appropriate, based on factors such as the cost of providing the same or a similar service or supply and the manner in which charges for the service or supply are made and the charge the administrator determines to be the "UCR" charge; (c) or the charge the administrator determines to be at the 80th Percentile made for that service or supply.

services have been reduced significantly. Aetna's actions raised concerns for NCMC that, because it was an out-of-network healthcare provider, Aetna was not properly processing its claims either under the Plans or making a proper determination of the UCR. Therefore, NCMC brought this suit claiming that Aetna substantially underpaid and/or wrongfully denied.

## III. PROCEDURAL HISTORY – OTHER MEMORANDA

In a related Memorandum Opinion, the Court addressed the plaintiff's ERISA § 502(a)(3) claim. *See* Doc. No. 348. As the Court stated there, citing to *Variety Corp.*, 516 U.S. at 512, "relief under that section is restricted to appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." The Court concluded that the plaintiff's remedy, if any, is under § 502(a)(1)(B). Therefore, the Court entered a summary judgment on NCMC's ERISA § 502(a)(3) claim. *See* Doc. No. 348 at 7-9.

Likewise, the Court dismissed NCMC's claim for penalties under ERISA § 502(c) because Aetna is neither a "designated" plan administrator nor a Plan sponsor of any of the Plans at issue in the case. *See* 29 U.S.C. §§ 1002(16)(A). In fact, it is undisputed that Aetna serves as a third-party administrator in behalf of Plan sponsors. In resolving this claim against NCMC, the Court rejects the NCMC's argument that Aetna is a *de facto* plan administrator under equitable jurisprudence. Where a Plan fails to make a designation of status, none can be

imposed except "as the Secretary may by regulation prescribe." 29 U.S.C. § 1002(16)(A). Moreover, the assignment of benefits by individual plan participants or beneficiaries does not *ispso facto* give NCMC participant/beneficiary status. Therefore, the Court granted Aetna's motion for summary judgment on NCMC's claim for penalties under § 502(c). *See* Doc. No. 348 at 9-13.

Because the Court is of the opinion that NCMC's claim arises solely as an ERISA claim, the Court also rejects NCMC's unjust enrichment claim and its state law claims under the Texas Insurance Code § 541, and the Texas Business Commerce Code §§ 17.46(b) and 17.46(b)(12). In the Court's view, Fifth Circuit authorities support the conclusion that NCMC's law claims save any non-ERISA claims not preempted by ERISA. *See NGS American, Ins. v. Barnes*, 998 F.2d 296, 299-300 (5th Cir. 1993). Moreover, Texas regulations exclude both self-funded and fully-insured ERISA plans. *See* Tex. Admin. Code § 7.1601(d).

NCMC'S breach of contract claim(s) and claim(s) for violation of various provision of the Texas Insurance Code concerning non-ERISA group health plans were severed from NCMC'S ERISA claim and are not addressed by the Court in this Memorandum. In papers filed in relation to NCMC'S various claims, Aetna concedes that it was not seeking summary judgment on (a) the plaintiff's ERISA § 502(a)(1)(B) claim to recover benefits under the terms of the assignments and the Plan or policies; and (b) the plaintiff's breach of fiduciary duty of loyalty and due

care under § 502(a) and § 3(21)(A), 29 U.S.C. § 1002(21)(A). The Court now addresses Aetna's motion for judgment as a matter of law on NCMC's ERISA claim.

## IV.   CONTENTIONS OF THE PARTIES

### A.   *NCMC's Contentions*

NCMC contends that Aetna violated ERISA § 502(a)(1)(B) and as a result failed to pay NCMC pursuant to the UCR or the terms of the Plans. NCMC asserts that it has suffered damages as a direct result of Aetna's conduct and, therefore, seeks monetary and equitable relief. In addition, NCMC seeks a declaratory judgment pursuant to 28 U.S.C. § 2201. In this regard, NCMC contends that it: (1) timely submitted its claims to Aetna in compliance with federal and state law; (2) did not engage in acts of fraud in seeking to recover healthcare benefits; (3) was entitled to be paid the UCR rate or the maximum reimbursable charge; and (4) it has either exhausted its administrative remedies on the claims, or determined that collection efforts are futile.

### B.   *Aetna's Contentions*

Aetna contends that NCMC's suit should be dismissed, pursuant to Fed. R. Civ. P. 52(c), as a matter of law, because the assignments are void for illegality or were obtained using illegal means. Aetna points to NCMC's "prompt pay discount" as the basis for its illegality assertion. In this regard, Aetna argues that

the "prompt pay discount program" is illegal because it eliminates all or a large portion of the patient's financial cost share obligation and, therefore, violates state law. Finally, Aetna contends that NCMC has failed to establish liability. Here, Aetna asserts that NCMC has failed to prove that Aetna's claim determinations are wrong, that Aetna abused its discretion in determining the UCR and that NCMC's damage model does not find support in the Plans at issue or even the relevant market.

## V.   LEGAL STANDARDS

### A.   *Standard of Review Under Fed. R. Civ. P. 52(c)*

Rule 52(c) of the Federal Rules of Civil Procedure provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). To this end, a court entering judgment pursuant to Rule 52(c) "must find the facts specially and state its conclusions of law separately" as denoted in Rule 52(a). Fed. R. Civ. P. 52(a)(1). Nevertheless, "Rule 52(a) does not require that the district court set out [its] findings on all factual questions that arise in a case." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1054 (5th Cir. 1997) (citing *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 433 (5th Cir. 1977)). Nor does it demand

"punctilious detail [or] slavish tracing of the claims issue by issue and witness by witness." *Century Marine Inc. v. U.S.*, 153 F.3d 225, 231 (5th Cir. 1998) (citing *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir. 1996) (quoting *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993)) (other citations omitted). Rather, a court's "[f]indings [are sufficient to] satisfy Rule 52 if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision." *Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir. 1985) (citing *Lujan v. New Mexico Health & Social Services Dept.*, 624 F.2d 968, 970 (10th Cir. 1980), citing *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422, 63 S. Ct. 1141, 1145, 87 L. Ed. 1485 (1943); *Stanley v. Henderson*, 597 F.2d 651 (8th Cir. 1979)).

Moreover, "[u]nlike the standard applicable in [12(b)(6)] judgments as a matter of law, when dismissing a case pursuant to Rule 52(c), a court is not required to make any special inferences or review the facts in the light most favorable to the plaintiff." *Weber v. Gainey's Concrete Prods., Inc.*, No. 97-31267, 1998 WL 699047, at *1 n.1 (5th Cir. Sept. 21, 1998) (citing *Sanders v. General Servs. Admin.*, 707 F.2d 969, 971 (7th Cir. 1983)); *see also Ritchie v. U.S.*, 451 F.3d 1019, 1023 n.7 (9th Cir. 2006) (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554 - 55, 110 S. Ct. 1331, 108 L. Ed.2d 504 (1990) ("The Supreme Court

has held with respect to Rule 52(c)'s predecessor that the district court need not give the nonmoving party any favorable inferences.")).

### B.  Standard of Review Under ERISA § 502(a)(1)(B)

The United States Supreme Court has generally held that the denial of a right to benefits under an ERISA plan is reviewed under a *de novo* standard.  *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed.2d 80 (1989); *see also Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 629 (5th Cir. 2004).  However, where the benefit plan expressly confers the "discretionary authority to determine eligibility for benefits or to construe the terms of the plan" on a plan administrator or fiduciary, the applicable standard of review is abuse of discretion.  *Firestone*, 489 U.S. at 115, 109 S. Ct. 948; *Baker*, 364 F.3d at 629; *see also Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp.2d 724, 731 (S.D. Tex. 2005) (citing *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999)).  Here, the various plans at issue vest the plan administrator with discretionary authority to determine eligibility for benefits and thus, the standard of review applicable is the abuse of discretion standard.

"Under the abuse of discretion standard, '[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail.'"  *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 397 - 98 (5th Cir. 2007) (quoting *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262,

273 (5th Cir. 2004)).  The substantial evidence rule requires "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  Under this standard, a decision is arbitrary when made "without a rational connection between the known facts and the decision or between the found facts and the evidence."  *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 342 (5th Cir. 2002) (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996)).

Ordinarily, when resolving factual controversies, the court's review is confined "to the evidence before the plan administrator."  *Vega*, 188 F.3d at 299 (internal citations omitted); *see also Wilbur v. ARCO Chem. Co.*, 974 F.2d 631, 639 (5th Cir. 1992).  It is not confined to the administrative record, however, when determining whether an administrator abused his discretion in interpreting the plan's terms and making a benefit determination.  *Wilbur*, 974 F.2d at 639.

The Fifth Circuit usually employs a two-step analysis when determining whether an administrator has abused its discretion in construing the plan's terms.  *James v. Louisiana Laborers Health and Welfare Fund*, 29 F.3d 1029, 1032-33 (5th Cir. 1994).  First, the court must determine whether the plan administrator's interpretation was the legally correct interpretation.  *Id.*  Second, if the plan administrator's interpretation was not the legally correct interpretation, then the court must consider whether the administrator's interpretation amounts to an abuse

of discretion. *Id.* However, "if the administrator's interpretation and application of the plan is legally correct, then [the] inquiry ends because obviously no abuse of discretion has occurred." *Baker*, 364 F.3d at 629 – 30 (citing *Spacek v. Maritime Ass'n*, 134 F.3d 283, 292 (5th Cir. 1998)).

Where, as here, the role of the plan administrator presents a conflict of interest because it evaluates claims for benefits, pays benefits and reimburses itself, the Court must consider this conflict as a factor in determining whether there has been an abuse of discretion. *Firestone*, 489 U.S. at 115, 109 S. Ct. 948 (citations omitted). However, the conflict of interest created by a plan administrator's dual role is "but one factor among many that a reviewing judge must take into account." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116, 128 S. Ct. 2343, 2351, 171 L. Ed.2d 299 (2008). Nevertheless, such a conflict does not necessitate that a court "create special burden-of-proof rules, or other special procedural or evidentiary rules" focused on the party with the apparent conflict of interest when other rules or standards are applicable. *Id.* With these parameters, the Court moves to a factual and legal analysis of the evidence.

## VI.   FINDINGS OF FACT

NCMC's ERISA claim was presented to the Court.  The evidence presented establishes the following:

NCMC is a "participating hospital under the guidelines of the Federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §§ 1395(dd) *et. seq*.  Aetna is a managed healthcare company that provides access to coverage and benefits to its members pursuant to a variety of Plans and policies of insurance, including: (a) self-funded Plans for which Aetna provides various third-party claims administrative services; (b) Plans insured under group policies issued by Aetna where Plans are established and maintained by private employers; (c) Plans covering federal employees; (d) Plans covering employees of state governmental entities; (e) church plans; (f) policies issued to individuals; and (g) Medicare.

Aetna also provides Plans and policies of insurance that include out-of-network benefits for services rendered to its members by "nonparticipating" providers. These providers have not entered into contracts with Aetna and have agreed to accept in-network rates as payment in full for their services.  Non-participating providers set their own fees for services rendered to their patients subject to the laws and regulations governing the practice of medicine in Texas.

NCMC is an out-of-network provider.  As such, it utilizes a "prompt pay discount program" known as "Access NCMC" created prior to the hospital opening

on January 4, 2007. The program does not violate Texas or federal laws. It is designed to collect from the patient up-front fees for services or collect them within a period of time thereafter and, in turn, offers a substantial discount for patient compliance. The program applies only to "qualified patients" who (a) paid for and maintain out-of-network benefits in their Plans; (b) agree to promptly pay the discounted amount at the time of admission or within 120 days thereafter the time that it normally takes to fully collect from most payors. The evidence shows that the program is not publically advertised, patients are advised concerning the program at or about the time of admission, and payors such as Aetna are notified in advance of the existence of the program. The program does not apply to emergency room admissions or to government insured patients.

The evidence shows that NCMC's "prompt pay discount program" closely follows the OIG Advisory Opinion No. 08-03—requirements that permit an exception to the Medicare/Medicaid prohibition of permitting healthcare providers to offer a discount to government insured patients, such as those covered by Medicare. While this model does not apply to private, non-government claims, such as those NCMC submits to Aetna, the Court determines that if followed by non-governmental entities, the prohibition against discounts is averted. The model permits discounts where: (1) the discount program is not publicly advertised; (2) the patient is advised of the program at or about the time of the service; (3) the

facility does not waive the amount as bad debt; (4) third party payors are advised of the program; (5) the waiver is made notwithstanding the reason for or the length of the services provided; (6) the waiver is not a part of an agreement between the provider and a third party payor; and (7) the amount paid by the patient is made within a short period of time. The Court finds these conditions are met by NCMC.

The evidence shows that NCMC advised all payors, including Aetna, on many occasions in writing that Aetna's members, who paid additional premiums for out-of-pocket benefits, could qualify for NCMC's "prompt pay discount program." Notice was issued on or about January 3, 2007, before the hospital opened, and continued thereafter for almost two years. The "comments" box no. 80 of the UB-04 electronic claim form also provided notice. When a patient has paid under the "prompt pay discount program," box 80 notes "prompt pay." Therefore, the Court finds that Aetna was advised on innumerable occasions of NCMC's application of this program to claims on a claim-by-claim basis.

Because NCMC was an out-of-network healthcare provider, Aetna utilized a re-pricing agreement in determining NCMC's claims. The evidence shows that over 5,000 claims were processed by Aetna through "re-pricing agreements." Under the re-pricing agreement system Aetna, upon receipt of a UB-04 claim form from NCMC, would either, directly or indirectly through its agents, contact NCMC to negotiate the claim(s) based on the billed charges in order to arrive at an

"allowed" amount. This "allowed" sum became the "usual, customary and reasonable care rate" or the "UCR".

From January 4, 2007, through December 31, 2008, Aetna entered into re-pricing agreements with NCMC. Either directly or indirectly, Aetna knew the charges that NCMC made for each CPT code for goods and/or services provided. In fact, Aetna payed NCMC's claims pursuant to the "allowed" charges without objection. At no time has Aetna claimed that NCMC failed to provide the goods and/or services reflected on NCMC's claim forms. Pursuant to the forms of the Plans and/or policies, no matter what NCMC's claims amounted to, Aetna, having "complete and absolute discretion," determined what it believed the UCR or allowed amount to be and thereafter calculated the benefit amount payable to NCMC.

Aetna's Plans and policies also cover expenses, including charges by hospital emergency rooms or free-standing emergency medical care facilities for treatment of emergency conditions. Aetna singularly reviews all ER claims from NCMC utilizing an RN and/or a physician to determine whether in their opinion(s), an "Emergency Medical Condition" existed. The evidence is unclear as to whether these determinations followed the prudent layperson standard. A prudent layperson standard requires Aetna to process ER claims using an average person's knowledge of medicine and health perspective. NCMC seeks to recover the

"preferred level of benefits" for emergency-based claims. However, NCMC has neither identified the specific claims on which it seeks such recovery nor produced applicable medical records on the claims where higher benefits are sought.

Therefore, there is no evidence that Aetna underpaid ER claims under the terms of the Plans. After reviewing all of the information submitted with respect to the claims, whether ER or outpatient, it appears that Aetna made determinations that have not been proven to be out of compliance with the express terms of the Plans. There is no evidence that Aetna failed to make determinations within the confines of the Plans. Therefore, it cannot be said that Aetna abused its discretion.

## VII. CONCLUSIONS OF LAW

The Court has jurisdiction of the case pursuant to 28 U.S.C. §§ 1332 and 1333. NCMC claims that Aetna underpaid its claims. The facts show that NCMC received assignments of benefits from Aetna's Plan members who were covered under ERISA Plans administered by Aetna. The assignment conferred the status of "beneficiary" upon NCMC pursuant to § 502(a), 29 U.S.C. § 1332(a). As a beneficiary, NCMC is entitled to recover benefits due under the terms of the applicable health benefit plans and pursuant to ERISA.

Aetna contends that NCMC's "prompt pay discount program" violates state law, particularly §§ 101.201, 102.003 of the Texas Occupations Code, on the basis that NCMC engaged in false, misleading or deceptive advertising. The Court is of

the opinion and concludes that the record is devoid of evidence to support Aetna's claim. *See* [Para. 4, Findings *Infra*]. Similarly, Aetna's arguments concerning the applicability of § 324.101 of the Texas Health and Safety Code and § 552.003 of the Texas Insurance Code are unavailing. The statutes do not prohibit discounting a patient's bill for healthcare services. In all instances, the evidence fails to establish Aetna's affirmative defense(s), and its TEX. INS. CODE 552(a)(3) counterclaim. Instead, the evidence shows that patients were informed of what they should expect to pay, received itemized bills and were aware that NCMC was an out-of-network provider. In the absence of evidence to the contrary, the Court concludes that NCMC, at all times, acquired properly executed assignments, designating it as beneficiary as defined by ERISA.

In support of its contention that Aetna underpaid it, NCMC argues that Aetna adjudicated claims for the same or similar service under the same CPT codes, yet paid the claims inconsistently. As an example, NCMC argues that Aetna, for a person with the same or very similar ER needs, allowed 99 percent of the claim. However, when a second treatment under the same plan for the same member was required, Aetna only allowed 54 percent of the second claim. These inconsistencies coupled with Aetna's refusal to produce its fee schedule are at the center of NCMC's suit.

NCMC also asserts that at no time would Aetna produce any plans, its fee schedule or the information necessary for NCMC to examine the adjudication of its claim and make an independent determination as to whether the reimbursements were made pursuant to "UCR" or the plans. In support of this argument, NCMC points to § 104(B)(2) of ERISA for the proposition that ERISA requires that the administrator provide copies of the plan description and "other instruments" to any plan participant or beneficiary in order that the participant or beneficiary may determine whether the administrator has calculated the benefits payment correctly.

Relying on Department of Labor <u>Advisory Opinion</u> 96-14A, NCMC contends that "other instruments" includes "formulas, methodologies, schedules or the database used by the administrator to calculate a participant's or beneficiary's benefit entitlement. *See* 29 C.F.R. § 2520.104(b)(2) and (b)(4). Aetna refused to produce the instruments that NCMC requested. As a result of not being able to obtain Aetna's database, which NCMC claims it is entitled to have under ERISA regulations, NCMC presented a damage model based on an arithmetic calculation that follows the Multi-Plan, 25 percent of billed charges. Using that method, NCMC determined that it had been substantially underpaid.

The Court is of the opinion that case law, not the 1994 DOL Advisory opinion controls disposition of NCMC's § 104(B)(2) claim. In *Ehlmann v. Kaiser Foundation Health Plan of Texas*, the Fifth Circuit held that a plan participant or

beneficiary was not entitled to the database of the administrator or plan sponsor for purposes of determining benefit entitlement.  198 F.3d 552, 555 (5th Cir. 2000).  Other federal courts have followed this Circuit's determination.  *See In re Wellpoint, Inc., Out-of-Network UCR Rates Litigation*, 903 F.Supp. 880, 922 (C.D. Cal. 2012); *In re Aetna UCR Litig.* MDL No. 2020, Civ. No. 07-3541, 2015 WL 3970168 (D.N.J. June 30, 2015); *Franco v. Connecticut Gen. Life Ins., Co.*, 818 F.Supp. 2d 792, 821 (D.N.J. 2011).

    The Court concludes that the evidence fails to support a finding that Aetna underpaid NCMC on any ERISA claim.  As claim administrator, Aetna had discretionary authority to determine eligibility for benefits and construe plan terms.  A court is loath to reverse the administrator's finding because a reversal requires the court to find that the administrator abused its discretion.  *See Ellis v. Liberty Life Assurance, Co.*, 394 F.3d 262, 273-74 (5th Cir. 2004) *cert. denied* 125 S. Ct. 2941 (2005).  Discretionary authority to determine eligibility for benefits and to construe the terms of the plans rests in Aetna.  Therefore, without specific proof of underpayment as to each claim, the Court is without evidence and authority to set aside the administrator's determination of the "allowed" amount of each claim.  *See Firestone,* 489 U.S. at 115; *see also Baker*, 364 F.3d at 629.

It is, therefore, ORDERED that NCMC's ERISA suit fails, as a matter of law, and is dismissed pursuant to FRCP 52(c), for lack of proof that Aetna abused its discretion in paying benefits pursuant to various Plans.

SIGNED on this 29th day of October, 2015.

_____
Kenneth M. Hoyt
United States District Judge